

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| F.C.V., INC., individually and as a<br>representative of all others similarly situated | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 08 C 5507 |
| v. | ) | |
| | ) | Magistrate Judge Cole |
| STERLING NATIONAL BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On the surface, this might appear to be a routine case: A potential class member receives a notice of a class settlement in a case in the district court in New Jersey and does not respond – an event that is commonplace. After all, who wants to wade through a lengthy notice with legalese that is often intelligible only to its authors and where the payoff is often not worth the effort. Where the notice requires the recipient to opt out of the case, there is no adverse effect on the recipient who ignores the notice. He gets what other class members get. But this case is more complex and, certain of its facets are out of the ordinary.

For one thing, under the class settlement that gave rise to the instant case, the class *plaintiffs* paid the defendant – in some cases a fairly large sum – although at a substantially reduced rate from the amounts the defendants claimed were owed under the class plaintiffs' respective contracts.[1] So ignoring the notice to the class in the New Jersey case had consequences that differed from those in

---

[1] Sterling National Bank was one of many companies that purchased contracts from NorVergence, the defunct telecommunications company that had originally contracted with the class plaintiffs and thousands of other small companies throughout the United States. Under the terms of the class settlement in the New Jersey case, out of which the instant case grew, Sterling agreed to give a substantial discount to the plaintiffs on the amounts it claimed were due under the original NorVergence contracts.

more routine class actions. Under the terms of the New Jersey settlement, if a plaintiff did not opt out, and if they did not pay Sterling the discounted amount – either in a lump sum or on a monthly basis – a default judgment could be entered against the plaintiff for the nondiscounted amount due under the original contract. That is what happened to Hollywood Services, Inc. and more than 50 other class plaintiffs.

The dispute underlying the New Jersey class action was ubiquitous, with multiple lawsuits throughout the country involving 11,000 small businesses, thirty-five or more financing companies, and the Federal Trade Commission. A cursory search reveals 46 reported federal cases dealing with the dispute, from the Districts of Illinois, New Jersey, California, Florida, Pennsylvania, Missouri, Ohio, Minnesota, and New York. There are an additional 35 state court cases reported, from many of those same jurisdictions, as well as Texas, Georgia, Iowa, Michigan, Colorado, Connecticut, Massachusetts, and Maryland.

The disputes were over what the FTC and the small businesses who dealt with NorVergence would call a telecommunications scam – a nationwide fraud of epic proportions – and what the financing companies who purchased the NorVergence contracts would call enforcement of a simple contract that included provisions common to all such contracts. Extended discussions of the history of the NorVergence debacle may be found in *Windy City Metal Fabricators & Supply, Inc. v. CIT Technical Financing Services, Inc.*, 536 F.3d 663 (7th Cir. 2008); *IFC Credit Corp. v. Aliano Bros. General Contractors, Inc.*, 437 F.3d 606 (7th Cir. 2006); and *F.T.C. v. IFC Credit Corp.*, 543 F.Supp.2d 925 (N.D.Ill. 2008) – to name but a few.

Having failed to opt out of the New Jersey litigation, and having failed to pay Sterling the discounted amount due under the class settlement agreement, Hollywood Services, Inc. was subject

to entry of a default judgment in the New Jersey case. That is exactly what happened. Hollywood has moved to quash a citation to discover assets Sterling filed against it in this district and to vacate the default judgment entered against it in the United States District Court for the District of New Jersey, claiming that court was without jurisdiction to have entered the default judgment.

## BACKGROUND
### A.
### What Norvergence Wrought

The "Helen" that launched all this trouble was a New Jersey telecommunications company, now bankrupt, called Norvergence. It was in the business of leasing telecommunications service packages to business customers. This was its hook: no matter what a customer said they were already paying, Norvergence could better it, substantially. Norvergence explained that it was all thanks to some wonderful and alluring gadgetry called the Matrix Solution, which was no doubt designed to evoke subliminal images of the Hollywood movie. It sounded too good to be true – and, of course, it was.

Under the agreement, customers "leased" the Matrix Solution equipment from Norvergence. The cost of the "lease" was enormously expensive in relation to the hardware's actual cost, but the bill for the telecommunications services was so low that the customers still looked forward to substantial savings. And, in some cases, it started out that way. But the chief utility for Norvergence of the "Matrix Solution" was its capacity to fool the gullible and the trusting. As for Hollywood monikers, it was really what Alfred Hitchcock would have called a "MacGuffin," and didn't have anything to do with providing savings. The way Norvergence strung customers along was by subsidizing the cost of the telecommunications services they were paying for. It funded the subsidies

3

with the monies obtained from assignments of the lease agreements to various financing companies. But Norvergence couldn't keep up the scheme indefinitely, and it ultimately went bankrupt.

At this point, the finance companies came calling on the customers demanding payment under the terms of the purported equipment leases. Understandably, the customers who were now without telecommunications services balked at paying for equipment that was effectively worthless and which, in some cases, either didn't work at all or had never been installed by NorVergence. The finance companies, however, pointed to the "hell or high water" clause in the leases, which plainly said the customers were on the hook for renting the hardware whether they received service or not – service was separate. And the finance companies argued they bought the leases fair and square, so the customers couldn't use Norvergence's fraud against them. Not surprisingly, everyone started heading to court.

## B.

### What Brought Sterling and Hollywood Into The Picture

One of the dozens of ensuing lawsuits was *F.C.V., Inc. v. Sterling National Bank*. It was filed in federal court in New Jersey in September 2004, on behalf of a class of "all persons and entities that entered into agreements with Norvergence, Inc." *F.C.V., Inc. v. Sterling National Bank*, 2006 WL 1319822, *1 (D.N.J. 2006). The finance company defendant in this instance was Sterling. The complaint sought damages and declaratory and injunctive relief terminating the plaintiffs' obligations to make lease payments to Sterling based upon claims for fraud and negligent misrepresentation. Sterling denied any wrongdoing, and insisted it was entitled to be paid under the so-called rental agreements it purchased from Norvergence.

4

In January of 2006, the parties executed a settlement agreement that the court preliminarily approved shortly thereafter. The court entered an order with respect to notice, fairness hearing, and administration, and it designated class counsel, approved the proposed form of notice to the class, and certified the action to proceed pursuant to Fed. R. Civ. P. 23(b)(3) on behalf of the class. In a nutshell, the settlement called for Sterling to discount by 33% the balances that the class members owed on the Matrix leases and forgive any late fees. The company would also disavow any interest it claimed in the equipment and withdraw any adverse credit reports it had filed. *Id.*, 2006 WL 1319822, *1-3.

The court held a fairness hearing on May 9, 2006. The settlement notice went out by first class mail in February 2006 to 274 class members, with well over half – 161 – opting out of the settlement. There were also five objections. The court was concerned by the high percentage of opt-outs, but noted that the number of objections was minimal. Reviewing the opt-outs, however, the court found that they were based on the customers' stance that they were victims of fraud and should not be liable for any payments, no matter how discounted. So the court felt that the significant percentage of the opt-outs did not really reflect on the fairness of the settlement. The court scrutinized the terms of the settlement under the relevant criteria and granted final approval on May 9, 2006. *Id.*, 2006 WL 1319822, *4-7. On May 30, 2006, the New Jersey District Court entered an Order for Final Judgment and Order Approving Class Settlement which stated that "no just reason exists for delay in entering final judgment." (Sterling Ex. I).

**C.**

**The Notice To the Class Members**

One of the class members receiving the settlement notice – and there is no dispute that it did (Hollywood Ex. D, Guliana Aff. ¶ 5) – was Hollywood. The notice was eight pages long, and was simple and explicit in its explanation of the recipients' options and the consequences of those options. In capitalized, bold face text, its opening words informed the recipients that they were receiving notice because they had rented NorVergence telecommunications equipment from Sterling National Bank, and emphasized that the class action that prompted the notice "**WILL AFFECT YOUR COMPANY'S RIGHTS.**" There was no "fine print" in the title or in the subsequent explanatory sections. The language could not have been plainer. It began by listing Sterling's obligations under the settlement:

> Pursuant to a proposed settlement in a class action lawsuit described below, Sterling is offering you the opportunity to pay off the Rental Agreement at a substantial discount and to settle any and all disputes between your Company, any individual guarantor and Sterling arising from the Rental Agreement. If this Settlement is approved, Sterling will:
>
> > (a) forgive thirty-three percent (33%) of the outstanding balance under your Company's Rental Agreement;
> >
> > (b) forgive any late fees, attorney fees, penalties and property insurance charges assessed on that account on or after July 15, 2004;
> >
> > (c) withdraw any and all adverse credit reports Sterling filed as a result of not receiving payment on the Rental Agreement on or after July 15, 2004; and
> >
> > (d) give up any claim of ownership to the NorVergence equipment in favor of your Company.

(Hollywood Ex. A, Notice, p. 1; Sterling Response to Motion to Quash, Ex. B at 1, Document 22-3).

Then, at the bottom of the first page, in bold type and in language intended to arrest the attention of the reader, there appeared this warning: "**Your Company's Or Guarantor's Rights Will Be**

**Affected Whether You Act or Don't Act. Please Read This Notice Carefully."** (Notice, p.1).

On the next page, the notice summarized in language and a format that was designed to facilitate understanding and to arouse the interest of the reader, the consequences of the various actions the recipient might take – or not take:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| YOUR COMPANY OR GUARANTOR CAN DO NOTHING | If your Company or Guarantor does nothing, your Company or Guarantor will automatically be included in the Class Settlement, and will receive all of the benefits of the Class Settlement, and your Company or Guarantor will be required to pay off your Company's Rental Agreement at a 33% discount. Your Company and any Guarantor and Sterling will agree to settle all claims that each has or could have arising from the Rental Agreement. |
| YOUR COMPANY OR GUARANTOR CAN EXCLUDE ITSELF FROM THE SETTLEMENT | If your Company or Guarantor does not want to receive the benefits of the Settlement and does not want to give up its right to be part of another lawsuit against Sterling, you must write to the Court to exclude your Company or Guarantor from the Settlement Class. |
| YOUR COMPANY OR GUARANTOR CAN OBJECT TO THE SETTLEMENT | If your Company or Guarantor does not want to exclude itself, but you do not like something about the Settlement, you may write to the Court to explain why you don't like the Settlement. |
| YOU CAN GO TO A HEARING | If your Company or Guarantor objects to the Class Settlement, you may also ask to appear in Court, either on your own or through an attorney of your choosing, and speak to the Court about the fairness of the Settlement. |

(Notice, p.2).

The notice went on to include a kind of "FAQ" section, explaining the nuts and bolts of the class action and settlement. (Notice, p. 2-4). This section concluded with another warning, again in bold type and in language that could not have been more direct: **"Your Company will automatically be considered part of the Class unless you write to the Court to say your**

**Company wants to be excluded from the Settlement.**" (Notice, p. 5). The notice then set forth

the recipient's obligations:

> **7. What are my Company's or Guarantor's obligations under the Settlement?**
> In exchange for the benefits listed above, your Company or Guarantor must agree to
> release Sterling from any claims concerning your Rental Agreement, as described
> more fully below. Your Company must also agree to pay Sterling the "Settlement
> Balance," which is the amount equal to sixty-seven percent (67%) of the outstanding
> balance under your Company's Rental Agreement as of the date the settlement
> becomes final, minus any attorneys' fees, late fees or penalties assessed your
> company since July 15, 2004.

(Notice, p.4). It went on to set forth the recipient's payment options, explaining that:

> If you do not exclude your Company from the Settlement Class, Sterling will send
> an invoice to your Company, setting forth your Company's Settlement Balance and
> installment payment option. Your Company may make a lump sum payment of the
> entire Settlement Balance within ten (10) calendar days of the date of the Sterling
> invoice if you like.
>
> If your Company does not make a lump sum payment within ten (10) calendar days
> of the date of the Sterling invoice, Sterling will assume that your Company chooses
> to pay the Settlement Balance in installments as set forth below, and the first such
> payment will be due on the date set forth in the invoice. Your company will be billed
> the monthly installment amount set forth in your Rental Agreement. However, you
> will only have to pay two-thirds of the number of installments due under the present
> terms of your Rental Agreement.
>
> If your Company begins paying the Settlement Balance in installments, and remains
> current, your Company may pay off the <u>remaining</u> balance at any time without
> penalty.

(Notice, p. 5). And then, there was yet another warning about the consequences of not opting out

of the class – but failing to pay:

> **IMPORTANT:** If you do not exclude your Company or Guarantor from the
> Settlement Class, but fail to pay Sterling the Settlement Balance on your Company's
> Rental Agreement, Sterling may seek to collect the remaining Balance by use of any
> remedies available to it under the Rental Agreement.

(Notice, p. 5).

8

An explanation of what rights the recipient would give up if it stayed in the class followed:

Unless you exclude your Company or Guarantor, your Company or Guarantor is staying in the class, and that means that they can't sue, continue to sue, or be part of any other lawsuit against Sterling about the legal issues in this case. It also means that all of the Court's orders will apply to your Company or Guarantor and legally bind them. If you do not exclude your Company or Guarantor from the Settlement, your Company or Guarantor will be bound by a "Release of Claims," which provides that:

> All members of the Class, and each of them (excluding members who have properly requested exclusion) are permanently barred and enjoined from instituting or prosecuting, either directly or indirectly, any claim that the Class or any member of the Class ever had, now have, or hereafter can, shall, or may have by reason of, or arising out of or relating to, any of the facts, transactions, actions, or conduct, actual or purported, alleged or which could have been alleged, in this action, including but not limited to any and all claims regarding the Rental Agreements entered into by the Class Members and NorVergence to finance the use of telecommunications equipment provided by that company which agreements were acquired by Sterling except that all parties retain the right to enforce the terms of the Settlement Agreement as those relate to the payment of the Settlement Balance on each Class Member's Rental Agreement.

(Notice, p. 5).

The notice then provided instructions for opting out of the settlement under the bold-faced heading, "**EXCLUDING YOUR COMPANY OR GUARANTOR FROM THE SETTLEMENT**."

(Notice, p.5):

### 10. How do I get my Company or Guarantor out of the Settlement?

To exclude your Company or Guarantor from the Settlement, you must send a letter by mail saying that your Company or Guarantor wants to be excluded from *FCV, Inc. v. Sterling National Bank*. Be sure to include your Company's or Guarantor's name, address, telephone number, and your name and signature. You must mail the exclusion request to each of these three (3) different places postmarked no later than **April 13, 2006:**

(Notice, p.6). The three addresses were provided, and the notice made clear that the recipient could not act through email or over the phone. (Notice, p. 6). The notice provided information about objecting to the settlement and attending the court's fairness hearing (Notice, p. 8) and concluded with yet another warning about the consequences of doing nothing:

### IF YOUR COMPANY OR GUARANTOR DOES NOTHING

**20. What happens if I do nothing at all?**

If you do nothing, your Company or Guarantor remain part of the Settlement Class and your Company or Guarantor will be obligated to pay Sterling the Settlement Balance (67% of the outstanding balance under the Rental Agreement). Also, unless you exclude your Company or Guarantor, your Company or Guarantor won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against Sterling about the legal issues in this case, ever again.

(Notice, p. 8).

Despite the clarity and conspicuousness of these repeated warnings and explanations, Mr. Guliana, on behalf of Hollywood, did nothing. not because he did not understand the meaning of the words but because they did not accord with how he thought class actions worked.[2] And so, he chose to rely on his imperfect understanding rather than on a notice from the United States District Court District of New Jersey that said in its opening line under the title that "[a] *federal court authorized this notice. This is not a solicitation from a lawyer.*" (Sterling Response to Motion to Quash, Ex. B at 1, Document 22-3)(italics in original). *See* discussion *infra* at 22.

---

[2] It is certainly a distinct possibility that Mr. Guliana never read the notice. But he has filed an affidavit saying he did and thus we proceed on the assumption that he reviewed the notice.

## D.
## Time To Settle Up

Following the fairness hearing and the court's final approval, Sterling mailed invoices, as mentioned in the notice, by first class mail to each class action plaintiff who did not opt out of the class; the one for Hollywood and Mr. Guliana went out June 29, 2006, (Sterling Ex. G) The invoice set forth Hollywood's discounted settlement balance – $29,920.33 – and, in keeping with the notice, informed that the first monthly payment of $837.52 was due July 15, 2006. (*Id.*). Hollywood – or Mr. Guliana – didn't make a payment or respond to the invoice at all, so Sterling took a further step. In keeping with paragraph 11(d) of the class action settlement agreement (Sterling Ex. E), Sterling sent Hollywood a notice of default that referred to the settlement agreement.

Neither Mr. Guliana nor anyone from Hollywood made inquiry about the settlement agreement or asked for a copy even though the class action settlement notice, under the heading, **"GETTING MORE DETAILS ABOUT THE SETTLEMENT,"** stated that the notice merely "summarize[d] the proposed settlement," and that "[m]ore details are in a Settlement Agreement," a copy of which can be obtained by writing to – the notice provided the name of the lawyers to whom to write – or by calling "(201)845-9600." (Notice, ¶21; Sterling Response to Motion to Quash, Ex. B, Document #22-3).

The notice of settlement agreement pointedly stated in paragraph 8, after the word, **"IMPORTANT,"** that if the recipient did not opt out of the settlement class and failed to pay under the settlement agreement, Sterling could "seek to collect the remaining Balance by use of any remedies available to it under the Rental Agreement." [3] The section of the Hollywood/NorVergence

---

[3] Obviously, Hollywood had a copy of the rental agreement to which it was a signatory.

rental agreement captioned "**REMEDIES**" provided, *inter alia*, that in the event of a default, NorVergence was entitled to receive immediate payment of the entire unpaid balance due under the equipment rental agreement, all costs including attorneys fees incurred in enforcing the agreement, and "any . . . remedy available at law or in equity." (Document #29).

The default notice to Hollywood informed it that it was in default on its obligations under the settlement agreement, and gave it ten days to cure. (Sterling Ex. H). Mr. Guliana and Hollywood concede receiving the notice of default. (*Motion to Quash*, ¶18). But, once again, they chose to do nothing. From there, things went down hill. Under the terms of the class action settlement agreement, if a class member failed to cure its default, Sterling could obtain a judgment for the full balance – with no 33% discount. (Sterling Ex. E, ¶ 11(d)).[4] To do so, all Sterling had to do was file "an affidavit" with the New Jersey District Court "setting forth the amount of the Balance Due, the manner in which notice of default was given and that there was a failure to cure said default." *Id.* The settlement agreement provided that, "No Class Member may defend against or attack such default judgment on any ground whatsoever, except upon a claim that there was no default under this Settlement Agreement or the notice of default given hereunder was materially defective." *Id.*

Nothing happened until February 22, 2007, when Sterling filed the affidavit the settlement agreement called for and requested that default judgment be entered against Hollywood and Mr. Guliana for failure to make the required payments. Sterling also sought default judgments against fifty-seven other class members. (Sterling Ex. J). On February 28, 2007, based on Sterling's

---

[4] That result could arguably be implied from the Remedies section of the Hollywood/ NorVergence Rental Agreement, itself.

affidavit, the court entered a default judgment against Hollywood and Mr. Guliana, jointly and severally, in the amount of $45,333.83; it also entered judgments against fifty-seven other defaulting plaintiffs. (Sterling Ex. K).

Nothing further happened for over a year-and-a-half. Then on November 23, 2008, Sterling registered the default judgment against Hollywood and Mr. Guliana in this court. *See* 28 U.S.C. §1963. When Sterling served Hollywood and Mr. Guliana with its citation to discover assets that same day, it was the first Hollywood and Mr. Guliana heard of the default judgment. They responded with a motion in this court to quash the citation and vacate the default judgment the New Jersey District Court entered against them.

## II.
## ANALYSIS

### Hollywood Must Go To New Jersey For The Relief It Seeks

To begin with, Hollywood can't get the default judgment vacated here. For that, it must go to New Jersey. The Seventh Circuit was rather clear about this in *Board of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031 (7th Cir. 2000). Judge Easterbrook, writing for the panel, put it this way:

> Logically the first question is whether a district court in which a judgment is registered under § 1963 may modify or annul that judgment under Rule 60(b). Some courts have held that the final sentence of § 1963 ¶ 1– "A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner."– means that the original judgment *becomes* a judgment of the court in which it has been registered, and therefore may be modified or set aside by the court of registration. . . . But § 1963 does not say that the original judgment becomes a local one; it says that the original judgment has the *effect* of a local judgment. This is a substantial difference, because the registered judgment does not lose its existence in the court that rendered the decree. Could the Southern District of Indiana tell the Eastern District of Virginia that it may not enforce its own judgment if, for example, [defendants] should have assets in

13

Virginia? A judgment may be registered in many districts, . . . and it would not make much sense to allow each of these districts to modify the judgment under Rule 60(b), potentially in different ways. . . . This circuit is among the majority that require Rule 60(b) motions to be presented to the rendering court.

212 F.3d at 1034 (citations omitted) (emphasis in original).

While it is clear that Hollywood's motion to vacate must be denied, that's not the end of analysis under *Elite Erectors*. Judge Easterbrook went on to explain that the registration court – where the judgment is registered under §1963 – is:

> free to disregard the judgment, without formally annulling it under Rule 60(b)(4), if the rendering court lacked jurisdiction. *Adam v. Saenger*, 303 U.S. 59, 62 (1938); *Hanes Supply Co. v. Valley Evaporating Co.*, 261 F.2d 29 (5th Cir.1958). A motion in the registration court under Rule 60(b)(4) is functionally identical to a motion to preclude enforcement under *Adam*; perhaps this is why *In re Joint Eastern & Southern Districts Asbestos Litigation*, 22 F.3d 755, 762 n. 15 (7th Cir.1994), approved the practice.[5] Whether or not the district court enters an order under Rule 60(b)(4), principles of issue preclusion would prevent relitigation of the jurisdictional question in other courts of registration.

212 F.3d at 1034.

---

[5] Actually, the court in *In re Joint Eastern & Southern Districts Asbestos Litigation*, 22 F.3d 755 (7th Cir.1994), seemed to have a different take on the issue. In a footnote, it was rather definitive about the registration court's power to *void*, as opposed to merely disregard, the rendering court's judgment:

> A judgment entered against parties not subject to the personal jurisdiction of the rendering court is a nullity. When, in an enforcement proceeding, the validity of the judgment is questioned on this ground, the enforcing court has the inherent power to void the judgment, whether the judgment was issued by a tribunal within the enforcing court's domain or by a court of a foreign jurisdiction, unless inquiry into the matter is barred by the principles of res judicata. *Baldwin v. Iowa State Traveling Men's Assoc.*, 283 U.S. 522, 525 (1931). While the original court's jurisdiction is presumptively valid, if the issue of jurisdiction has not previously been litigated it may be raised in the enforcing court. *Adam v. Saenger*, 303 U.S. 59, 62 (1938).

22 F.3d at 762 n.15.

Be that as it may, whatever the court may have meant in note 15, *Elite Erectors* has settled the question of a district court's power to annul a judgment under Rule 60(b)(4).

14

So the registration court doesn't have to adhere to the judgment if the rendering court lacked jurisdiction – meaning Hollywood can get the citation quashed here – but it can't vacate the judgment under Rule 60(b). This may seem to be a distinction without a great deal of difference, for the registration court must go through the jurisdictional analysis a Rule 60(b) motion would entail, and its resolution would give rise to issue preclusion in subsequent proceedings.

While *Asbestos Litig.* spoke in terms of the registration court "ha[ving] the inherent power to void the judgment," 22 F.3d at 762 n.15, and *Elite Erectors* spoke of being "free to disregard the judgment," 212 F.3d at 1034, neither dictated that any vacating or ignoring *had* to occur. How to respond to a Rule 60(b) motion is left to the court's discretion, *see Fuhrman v. Livaditis*, 611 F.2d 203, 204 (7th Cir. 1979), although in *Fuhrman*, the court said, "ordinarily," motions for relief from judgment had to be brought in the court that rendered the judgment:

> The powers of a district court to grant relief against a judgment registered there under 28 U.S.C. §1963 have not been comprehensively delineated. That it may grant relief in certain circumstances seems clear. . . . Few would argue, however, that the court of registration lacks discretion in appropriate circumstances to refer the parties to the court which rendered judgment. . . . (T)he analogy to the federal courts' traditional Forum non conveniens procedures is persuasive."

611 F.2d at 204 (citations omitted).

Leaving the decision of whether to entertain the motion to the registration court's discretion was, *Fuhrman* said, based on two major policy concerns: (1) comity among the federal district courts is furthered if the registering court refers the question of relief from judgment to the court which ordinarily entered the judgment; (2) efficient judicial administration is furthered if the registering court defers to the original court, which is likely to be more familiar with the issues raised by the motion for relief from judgment. *Id.* at 205. The court summarized its holding thusly: "While

we do not conclude that a registering court presented with a motion for relief from judgment based on lack of personal jurisdiction must in every instance defer to the court which originally issued the judgment, such deference is not an abuse of discretion in this case." 611 F.2d at 205. This "discretionary" rule appears to be the norm among the Circuits. *See Budget Blinds, Inc. v. White*, 536 F.3d 244, 252-54 (3rd Cir. 2008)(collecting cases).

In this case, comity and efficient judicial administration counsel against entertaining Hollywood's motion. True, the New Jersey District court was not interpreting local state law as was the rendering court in *Fuhrman*, but it is certainly more familiar with the issues raised in the motion, which attacks the class action notice and the settlement, itself. (*Memorandum of Law in Support of Hollywood's Motion to Quash Citation and/or Vacate Default Judgment*, at 8). Basically, Hollywood argues that the ordinary class action rules ought not to apply because, although it was nominally a plaintiff, it was treated more like a defendant, with a default judgment entered against it. (*Id.* at 9; *Reply Brief*, at 2-5).

The argument, however, ignores the fact that when it granted Sterling's motion for default against Hollywood, the district court in New Jersey certainly considered the permissibility of its action under the notice and the settlement agreement. That another court from another circuit, and one completely unfamiliar with the proceedings that the district court in New Jersey had overseen from the beginning, should step in at an hour well beyond the eleventh and review the New Jersey court's informed and thoughtful determinations would be exceedingly ill-advised, to say the least. It also would be offensive to principles of comity, which require respect among federal courts as they require respect between state and federal courts. *See Serlin v. Arthur Andersen & Co.*, 3 F.3d 221,

223 (7th Cir. 1993); *United States v. AMC Entertainment, Inc.*, 549 F.3d 760, 773 (9th Cir. 2008); *Budget Blinds*, 536 F.3d at 254.

Moreover, even though the New Jersey court wasn't applying local state law, it was applying "local" Third Circuit law, *F.C.V., Inc.*, 2006 WL 1319822, *3-5, and it is surely far more familiar with that than a district court here would be. *Berger v. Jasmine Ltd.*, 1996 WL 207190, 2 (N.D.Ill. 1996); *Abdur-Rahiim v. Doe*, 2009 WL 678348, 3 (E.D.Ky. 2009). While federal law is generally considered to be the same among all the circuits, there are subtle differences between the Seventh and Third Circuits in the factors to be considered when assessing a class action settlement. *Compare Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) *with In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516, 534 (3rd Cir. 2004). Courts in New Jersey may focus on certain factors that might not assume quite the same level of significance here. *See Synfuel Technologies*, 463 F.3d at 653 (7th Cir. 2006)(most important factor relevant to the fairness of a class action settlement is the strength of plaintiff's case on the merits balanced against the amount offered in the settlement); *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d at 535 ("We have previously directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'").

All these considerations counsel against entertaining Hollywood's motion to vacate and quashing the citation to discover assets. The proper venue for the Rule 60(b) motion is the New Jersey District Court, which rendered the decision Hollywood wants to overturn, and quashing the citation would be appropriate if such a motion proved successful. Both the Third and Seventh

Circuits afford their district courts a degree of deference in handling class action matters. *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d at 535; *Synfuel Technologies*, 463 F.3d at 652. Respect for that deference requires that a district court almost half a continent away not interfere with the judgment of the district court in New Jersey. The Third Circuit, when considering the propriety of vacating another district court's judgment, put it well:

> We decline to establish a categorical rule stating that registering courts lack the power to use Rule 60(b)(6) to vacate the judgments of rendering courts, but we emphasize that registering courts should exercise this power only under very limited circumstances. Even when a court is considering its own judgment, "extraordinary circumstances" must be present to justify the use of the Rule 60(b)(6) catch-all provision to vacate the judgment. When a court is considering whether to vacate another court's judgment under Rule 60(b)(6), these circumstances must be even more "extraordinary" because of the additional interest in comity among the federal district courts. We need not decide exactly how "extraordinary" a circumstance must be to justify the vacatur of another court's judgment. The circumstances of the instant case would not even be extraordinary enough to justify a court's decision to vacate its own judgment. It follows, *a fortiori*, that they are not extraordinary enough to justify vacating the judgment of another court.

*Budget Blinds*, 536 F.3d at 251-52(citations omitted).

As it is clearly the better course not to entertain such a motion here, Hollywood's motion is denied. Nevertheless, a brief review of the underlying facts demonstrates that the "extraordinary circumstances" that might merit relief – if I were authorized to vacate the New Jersey judgment – are not present here.

## B.

### The Notice to Hollywood and Other Prospective Class Members Was Sufficient

As already discussed, the gravamen of Hollywood's complaint is that because the class plaintiffs agreed to pay Sterling, the New Jersey District Court was prevented by due process from employing an opt out procedure and apparently was precluded from employing the form of notice

it employed. Having employed the mechanism it did, the district court did not obtain jurisdiction over the class plaintiffs and was prevented from entering the default judgment against Hollywood.[6]

First, it ignores the fact that the plaintiffs did not simply pay Sterling. Quite the contrary. The class received an immediate, significant, economic benefit under the settlement agreement in the form of a 33% discount on the amount that Sterling claimed it was owed under the NorVergence rental agreements. This discount amounted to many thousands of dollars. In addition, Sterling forgave late fees, attorneys' fees, penalties and property insurance charges and any claim of ownership to the NorVergence equipment. Lastly, Sterling agreed to withdraw any adverse credit reports it had filed against any of the class plaintiffs.

While it is true that in the run of the mill class action settlement, plaintiffs do not pay, it is no less true that the value of what the class plaintiffs in the New Jersey litigation received by way of settlement was vastly greater than the value of that which the plaintiffs receive in most class action settlements. Often those settlements amount to an exceedingly small amount of money – sometimes as little as $9 as in *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348 (7th Cir. 1996) – and, if they are lucky, perhaps a coupon whose value is dubious. Of course, the plaintiffs might have won the case and would not have had to pay Sterling anything. They also could have lost. *Cf.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810 (1985)( "a valid adverse judgment may extinguish any of the plaintiffs' claims which were litigated.").

It was the ultimate judgment of the skilled class counsel that the interests of the class were best served by compromising the plaintiffs' claims and accepting the very significant economic and

---

[6] It is worth noting that Hollywood consented to being sued in New Jersey when it signed the NorVergence rental agreement. *See Aliano Bros.*, 437 F.3d at 609-12.

other benefits to which Sterling agreed. And, it was the informed judgment of the District Court in New Jersey that the settlement was indeed fair. Hollywood's argument puts out of view the economic realities of the settlement and the inherent risks of litigation, which were eliminated by the settlement. Viewed from the perspective of due process, there is no meaningful distinction between the New Jersey class action and the more routine class action where the plaintiffs pay nothing, and often receive effectively that on an individual basis.

To support its contention, Hollywood relies on what it calls the "holding" in *Kamilewicz*, which it portrays as authorizing review of class actions where class members *unknowingly* fell prey to settlements that result in *net financial losses* to the class members. (*Memorandum of Law in Support of Motion to Quash and/or Vacate Default Judgment*, at 7-8). However, it is not a holding at all, but a dissent from an order denying a petition for rehearing. *Kamilewicz*, 100 F.3d at 1349. Authored by Judge Easterbrook and joined by Judges Posner, Wood, Manion and Rovner, it cannot to be cavalierly ignored. But the situation there simply is not comparable to what occurred here.

The plaintiff class in *Kamilewicz* was literally ambushed by the settlement, which called for the class members' bank – which was failing to promptly post interest to their escrow accounts – to not only credit their accounts with "paltry sums" – no more than $9 – but deduct a share of the class counsel's $8,000,000 fee from those accounts as well. This resulted in a net loss of nearly $90 to the average class member. The impending losses "were known to those who negotiated the settlement, but were not disclosed to the class members," who "were "ignorant of their exposure." 100 F.3d at 1349. As Judge Easterbrook explained:

> Settlement ensued, and the class members learned only what the notice told them. Few opted out or objected, because the maximum award to any class member was

less than $9. Any recovery, however small, seemed preferable to initiating a separate suit or even bearing the costs of protesting the settlement's terms.

100 F.3d at 1349. He went on to say that a collateral attack against such a judgment based on lack of personal jurisdiction was "especially appropriate" because "class members [we]re stunned to find that, although aligned as plaintiffs, they [we]re net losers, just as if the original defendants had filed and prevailed on a counterclaim of which they received no notice and over which the state court had no jurisdiction. 100 F.3d at 1350.

But Hollywood and Mr. Guliana could not have been stunned. The notice was explicit and repetitive about the consequences of not opting out: class members who did not opt out would be on the hook for 67% of what they owed on their original rental agreement with NorVergence. The notice explained in no uncertain terms at least four times what would happen if a recipient did not act to opt out of the settlement. More accurately, it drove the point home like Dr. Seuss: in a box (Notice, pg. 2), in bold type (Notice, pg. 4), following the all-caps, bold-type **"IMPORTANT"** (Notice, pg. 5), and below the all-caps, bold-type heading **"IF YOUR COMPANY OR GUARANTOR DOES NOTHING."** (Notice, pg. 8).

It informed the recipient no fewer than five times that if it did not opt out – if it remained in the class – it would be responsible under the settlement agreement for 67% of the amount it otherwise would have owed under the original Norvergence agreement. (Notice, pgs. 1, 4). At least twice, it also made it clear that if the recipient did not opt out, it would be unable to start a lawsuit, continue a lawsuit or be part of any other lawsuit against Sterling regarding the legal issues in the case. (Notice, pgs. 5, 6). And it did all this in luminously clear, easy-to-understand, non-legal language. It simply is reasonable to contend that the notice insufficiently conveyed the consequences

21

of failing to opt out of the case. *See Matter of VMS Ltd. Partnership Securities Litigation*, 26 F.3d 50, 52 (7th Cir. 1994)(clarity of notice undermines argument that recipient who failed to opt out should not be held to its terms because he did not understand the notice).

Nor can it be said that Hollywood and the other class members were "net losers." They were net winners, having obtained a 33% reduction in the amount of money Sterling claimed it was owed, plus they were no longer potentially liable for various kinds of fees, including attorneys' fees and any adverse credit reports would be withdrawn. In short, unlike the plaintiffs in *Kamilewicz*, the plaintiffs were not "ignorant of their exposure," and Judge Easterbrook dissenting opinion does not advance Hollywood's arguments one millimeter.

Reduced to its essentials, Hollywood's argument for inadequacy rests on Mr. Guliana's claimed lack of understanding :

> I did not understand it at the time it was received. I had always thought that if I did nothing in a class action, I would simply not receive my portion of a settlement. I did not know if I did nothing in a class action, that I would automatically be exposing myself to liability in the form of a judgment. As neither I nor [Hollywood] were previously sued by [Sterling], I did not think that this notice applied to me or [Hollywood] with respect to a default judgment without notice. I was further unaware that failing to take action (i.e. opting out) would waive any due process rights I had before judgment was entered against me or [Hollywood].

(Guliana Aff., ¶ 5).

Mr. Guliana's claim is at once unpersuasive and legally irrelevant. Tellingly, he does not contend that the notice was textually inadequate or inherently misleading or ambiguous. He does not explain what there was about the notice's straightforward explanations that possibly could have confused him or led him to think that he did not have to pay 67% of the original NorVergence debt if he did not opt out. At bottom, his claim is not that the notice was opaque but that it did not

comport with how he "had always thought" class actions worked, namely that members of the class received some sum of money, not that they had to pay.

And so, Mr. Guliana chose to rely not on the textually clear notice that expressly stated at the outset that it had been "authorized" by "[a] *federal court" in New Jersey,* (Sterling Response to Motion to Quash, Ex. B at 1, Document 22-3)(italics in original), but on himself. But solipsism is not a theory the law recognizes. Just as one claiming to be the victim of a fraud, cannot argue that he relied on oral statements inconsistent with written documents, *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998), neither can the recipient of a class action notice claim inadequacy because he chose to ignore its plain language in preference to his own inexpert understanding of how he thought things ought to be.

Assuming that the affidavit was not a tale spun for the occasion, the remainder reveals a rather high degree of legal sophistication: "I did not think that this notice applied to me or [Hollywood] with respect to a default judgment without notice. I was further unaware that failing to take action (i.e., opting out) would waive any due process rights I had before judgment was entered against me or [Hollywood]." (Brackets and parentheses in original). Of course, the degree of sophistication evidenced by the last two sentences of the affidavit is inconsistent with the claim made in the first sentence. But be that as it may, the fact remains that Mr. Guliana's faulty understanding stemmed from his failure to have requested a copy of the settlement agreement as the notice told him he could and his unwillingness even to have made a single phone call to the number in the notice in order to ascertain the details of the settlement agreement.

Not only is the claim of misunderstanding belied by the simplicity and clarity of the notice, but more importantly, *post-hoc* claims like these are measured objectively, not subjectively. The

question is not whether a particular recipient understood the contents of the notice, but whether the notice reasonably conveyed the necessary information to the average class member. *Masters v. Wihelmina Model Agency*, 473 F.3d 423 (2nd Cir. 2007). *See also Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2004 WL 1459486, *2 (N.D.Ill. 2004)("In general, the court will assume that the class members are literate and able to understand a notice such as the opt-out notice.").

In other contexts, it is insufficient for a party to contend that it did not understand a document that plays a critical role in the case. For example, in a debt collection case, a consumer cannot prevail simply by insisting that he was confused by the collection letter. Rather, the question is whether the average, unsophisticated consumer would have been confused by the letter on which the claim is based. *See Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 774 (7th Cir. 2007).[7] Similarly, the test of contractual ambiguity is not what the parties thought the words of the contract meant, but what a reasonable person in that setting would have thought them to mean. *See Aliano Bros.*, 437 F.3d at 611 (holding that any Norvergence customer reading the equipment rental agreement would know its terms); *Waterloo Furniture Components, Ltd. v. Haworth, Inc.*, 467 F.3d 641, 645 (7th Cir. 2006)(in contract construction, language can only be deemed ambiguous if it may *reasonably* be understood in different ways).

Not a single case is cited to support the proposition that the notice in the instant case did not sufficiently inform the recipients of the consequences of not opting out of the class and of the consequences of non-payment of the discounted amount that the class members agreed would be

---

[7] Quite apart from its text, the fact that 161 of the 274 potential class members had no difficulty opting out is further proof of the clarity of the notice measured by the objective test of reasonableness. *Compare Phillips Petroleum*, 472 U.S. at 813 ("in this case, over 3400 members of the potential class did 'opt out,' which belies the contention that 'opt out' procedures result in guaranteed jurisdiction by inertia.").

paid to Sterling under the settlement. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) does

not support Hollywood's argument. There, the Supreme Court held that a Kansas trial court had

jurisdiction over a nation-wide, certified class of 28,100 plaintiffs, because class actions are

generally exceptions to the rule that "one could not be bound by judgment *in personam* unless one

was made fully a party in the traditional sense." *Id.* at 808. (*Reply Brief*, at 2). The Court refused

to equate the position of an out-of-state class action plaintiff with an out-of-state defendant and held

that due process did not require that class actions allow for "opt-in" as opposed to "opt-out" notice.

*Id.* at 810-811. All that is required is that a class action plaintiff receive the best practicable notice

that is:

> 'reasonably calculated, under all the circumstances, to apprise interested parties of
> the pendency of the action and afford them an opportunity to present their
> objections.' The notice should describe the action and the plaintiffs' rights in it.
> Additionally, we hold that due process requires at a minimum that an absent plaintiff
> be provided with an opportunity to remove himself from the class by executing and
> returning an 'opt out' or 'request for exclusion' form to the court.

*Id.* at 808. These requirements were plainly met by the class notice in New Jersey.

The Court also noted that "[b]ecause States place fewer burdens upon absent class plaintiffs

than they do upon absent defendants in nonclass suits, the Due Process Clause need not and does not

afford the former as much protection from state-court jurisdiction as it does the latter." 472 U.S. at

811. The Court further differentiated the two situations:

> The burdens placed by a State upon an absent class-action plaintiff are not of the
> same order or magnitude as those it places upon an absent defendant. An out-of-state
> defendant summoned by a plaintiff is faced with the full powers of the forum State
> to render judgment *against* it. The defendant must generally hire counsel and travel
> to the forum to defend itself from the plaintiff's claim, or suffer a default judgment.
> The defendant may be forced to participate in extended and often costly discovery,
> and will be forced to respond in damages or to comply with some other form of
> remedy imposed by the court should it lose the suit. The defendant may also face

> liability for court costs and attorney's fees. These burdens are substantial, and the minimum contacts requirement of the Due Process Clause prevents the forum State from unfairly imposing them upon the defendant.

*Id.* at 808 (emphasis in original). Relying upon the distinction made in *Phillips Petroleum,* Hollywood contends that it was a *de facto* defendant, and therefore it could not have been included in the plaintiff class through an opt-out procedure. No case supports the argument, and the attempted distinction between a class action plaintiff and a *de facto* defendant – if it has any viability – simply does not work here. Whatever else may be said, it is simply wrong to try to equate Hollywood with "a defendant in a normal civil suit." *Phillips Petroleum,* at 810.

Unlike a defendant in a civil suit, the class action plaintiffs in the New Jersey suit were "not required to fend for [themselves]." *Id.,* at 809. Those interests were protected by the named plaintiff, class counsel – whom they did not have to hire or pay directly – and the court. *Id.* Of course, it is true that by not opting out, Hollywood and other potential class members agreed to pay money to Sterling. But that risk, so clearly disclosed in the notice, was easily eliminated by the simple act of opting out of the suit – an option not accorded a defendant in a civil case.

Cases involving defendant class actions – none of which are cited in Hollywood's briefs – undercut Hollywood's arguments. Significantly, the plain language of Rule 23(a) makes no distinction between class plaintiffs and class defendants: "One or more members of a class may sue *or be sued* as representative parties on behalf of all members only if . . . ." (emphasis supplied); *CIGNA HealthCare of St. Louis, Inc. v. Kaiser,* 294 F.3d 849, 853 (7th Cir. 2002); *Kaucky v. Southwest Airlines Co.,* 109 F.3d 349, 350 (7th Cir.1997); *Henson v. East Lincoln Tp.,* 814 F.2d 410, 412 (7th Cir. 1987)(suits against a defendant class "plainly are permitted under (b)(1), . . . Nor is there anything to preclude them under (b)(3)"); *In re Integra Realty Resources, Inc.,* 262 F.3d 1089, 1110

(10th Cir. 2001); *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2nd Cir.1995)("Although plaintiff classes are certified more frequently, we have held that the [rule's certification] requirements apply equally to plaintiff and defendant classes."). The rule imposes the same notice requirements, regardless of type of class member. Fed. R. Civ. P. 23(c)(2), (e); *In re Integra Realty*, 262 F.3d at 1110 ("Although Rule 23 expressly contemplates defendant class actions, . . . Rule 23 imposes no special procedural requirements to protect the interests of unnamed defendant class members *vis-à-vis* plaintiff class members."). Such class actions may be rare, but are not forbidden.

Indeed, if there are obstacles to defendant classes, they seem more often to be in certification, rather than notice. *See Pabst Brewing Co., Inc. v. Corrao*, 161 F.3d 434, 439 (7th Cir. 1998)("This court . . . has had occasion to note that the due process rights of unnamed class members of a defendant class are entitled to special solicitude, and their due process interests preclude altogether a defendant class under Rule 23(b)(2)."); *Tilley v. TJX Companies, Inc.*, 345 F.3d 34 (1st Cir. 2003). In terms of notice provisions and jurisdiction over defendant classes, courts appear to have been most concerned that there be "opt-out" rights for defendant class members. *Channell v. Citicorp Nat. Services, Inc.*, 89 F.3d 379, 387 (7th Cir. 1996); *Henson*, 814 F.2d at 410. After all, if there are, any member of a defendant class can opt out of the class and not be bound by the judgment. *Id.* The Seventh Circuit has noted that "when class members are given the right to opt out (as members of the class in this case were), it is *possible* to enter a money judgment against a class." *Channell*, 89 F.3d at 387(emphasis in original).

Quite apart from the fact that the New Jersey settlement did not merely result in an obligation to pay money to Sterling but accorded class members very substantial economic and other benefits,

the above cases are a sufficient answer to Hollywood's objections to the default judgment, to the enforcement of the citation to discover assets, and to the contention that since the class plaintiffs were *de facto* defendants, Sterling cannot enforce the default judgment.

That Mr. Guliana chose, after reading the notice, not to opt out signifies either a desire to participate in the class settlement or, if his claim of misunderstanding is to be accepted, a defect in his analysis. It signifies nothing, however, about the adequacy of the notice sent to the class. Instead of taking further action to ascertain why the explanations in the notice varied from his necessarily inexpert understanding of how class actions work, Mr. Guliana chose to do nothing: he neither opted out, made any inquiry about the settlement agreement – as he could have done with a simple phone call – or requested a copy of the settlement agreement as the notice informed him he could. And he did not do so even though he had over two months to take some action.[8] He cannot now be heard to complain about the consequences of those volitional decisions.[9]

While Hollywood may prefer the notice approved by the Superior Court of New Jersey in an unreported case, *Exquisite Caters, LLC v. Popular Leasing USA, Inc.*. (*Memorandum of Law in Support of Motion to Quash and/or Vacate Default Judgment*, at 11), that case does not compel the conclusion that the notice approved by the New Jersey district court was insufficient. The notice in *Exquisite Caters* obviously is not and cannot be the template for all class actions. It was simply one state court judge's response to a set of circumstances with which he was confronted. Trial judges

---

[8] Hollywood says the notice was went out February 8, 2006. The notice gave recipients until April 13, 2006, to opt out. (Notice, p. 6).

[9] *Cf. R.H. Stearns Co. v. United States,* 291 U.S. 54, 61-62 (1934) (Cardozo, J.) (" 'He who prevents a thing from being done may not avail himself of the non-performance which he has himself occasioned, for the law says to him in effect "this is your own act, and therefore you are not damnified....' "); *Roe v. Flores-Ortega,* 528 U.S. 470, 477 (2000); *United States v. Goodwin,* 449 F.3d 766, 772 (7th Cir.2006).

enjoy broad discretion in deeming how best to handle class action issues. When a matter is committed to the discretion of a district judge, "it is possible for two judges, confronted with the identical record, to come to opposite conclusions and for the appellate court to affirm both. That possibility is implicit in the concept of a discretionary judgment." *United States v. Banks*, 546 F.3d 507, 508 (7th Cir. 2008). So it is not surprising that two district courts might approve two different types of class action notices, and both types could be perfectly acceptable. This is also a compelling reason why a district court in Illinois has little or no business disturbing the rulings of a New Jersey district court.

Second, lower court opinions, even in the federal system, "are not authoritative; [they] do not have precedential authority." *Matheny v. United States*, 469 F.3d 1093, 1097 (7th Cir. 2006). And finally, it is unlikely the notice employed in *Exquisite Caters* would have alleviated Hollywood's problems. Apparently, the Federal Trade Commission objected to the original terms of settlement in that case, and asked that the court not approve it. Failing that, the FTC asked that class members affirmatively opt *in* to the settlement. (Hollywood Ex. E, at 8).

Neither thing happened, but the FTC was able to negotiate a provision whereby a class member that had opted in by mistake would be able to maintain their defenses against the leasing company. (*Memorandum of Law in Support of Motion to Quash and/or Vacate Default Judgment*, at 11). According to Hollywood, this "ensured that any class member would have its day in court if so desired." (*Memorandum of Law in Support of Motion to Quash and/or Vacate Default Judgment*, at 11). No it didn't; it only provided a safety valve for those class members that opted in *by mistake*. Nothing in *Exquisite Caters* supports the theory that the kind of "mistake" it had in mind was what occurred here, namely that a class plaintiff chooses not to opt out because the

otherwise clear notice simply did not accord with his view of how class actions worked. So Hollywood would have been in the same position it is now. And, seeing as the safety valve itself was the result of an *objection*, doesn't this beg the question: why didn't Hollywood object?

In short, the notice that Hollywood and the other class members received sufficiently informed the recipients of their right to opt out and of the consequences of their failure to do so, including the fact that if they failed to pay Sterling the "Settlement Balance" (i.e., the 67% discounted amount under the NorVergence rental agreement), the defaulting party would be liable to collect the remaining balance by use of any remedies available to it under the rental agreement. The Settlement Agreement, about which Hollywood made no inquiry, provided further details of what would occur in the event of a default. Hollywood chose to ignore the Settlement Agreement just as it chose to ignore the notice of default. Under *Elite Erectors* and *Fuhrman*, Hollywood would not be entitled to relief and its motion to quash the citation to discover assets would be denied.

The remainder of Hollywood's contentions would not have to be addressed, because they deal with notice in regard to the default judgment the New Jersey district court entered against it. One wonders whether a notice of default judgment would have made much difference here. Mr. Guliana ignored the invoice Sterling sent. Then he ignored the default notice that followed. Hollywood complains that it never received the notice of the default judgment, but who can say that the pattern Mr. Guliana established would not have continued. The evidence rather strongly suggests that it would.

Even so, the lack of a notice of the default judgment doesn't mean the New Jersey court lacked jurisdiction to enter the default judgment. Under Fed. R. Civ. P. 55(b)(2), a party that has

appeared in a case is entitled to three days notice of an application for a default judgment.[10] But the failure to provide such notice is not a jurisdictional defect, but a procedural one. *Planet Corp. v. Sullivan*, 702 F.2d 123, 126 n.2 (7th Cir. 1983). As such, it is not appropriate subject matter for a Rule 60(b)(4) motion, *id,*, or for any motion to vacate another district court's default judgment, or even a motion asking that the court merely ignore the judgment and quash a citation, given the Seventh Circuit's rulings in *Elite Erectors* and *Fuhrman.*

## CONCLUSION

Under current Seventh Circuit precedent, I do not have the authority to set aside the default judgment of the New Jersey District Court. Nor do I think there is a basis to "annul" that decision by quashing the citation to discover assets. To the extent that I have discretion to take either action, I decline to do so. The District Court in New Jersey is a more appropriate forum to attack either the settlement agreement or the default judgment, and there is no reason why the current motion cannot be immediately filed there. For the foregoing reasons, Hollywood's Motion to Quash Citation to Discover Assets and/or Vacate Default Judgment [19] is DENIED.

JEFFREY COLE
UNITED STATES MAGISTRATE JUDGE

DATE: September 3, 2009

---

[10] A non-appearing party is not even entitled to such notice. *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 599 n.3 (7th Cir. 2007); *Zuelzke Tool & Engineering Co., Inc. v. Anderson Die Castings, Inc.*, 925 F.2d 226, 231 (7th Cir. 1991) .